In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2632

LEVELL TAYLOR,

*Petitioner-Appellant*,

*v.*

RANDY GROUNDS, Warden,
Robinson Correctional Center,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 7489—**Gary Feinerman**, *Judge*.

ARGUED MARCH 1, 2013—DECIDED JULY 3, 2013

Before ROVNER, WILLIAMS, and HAMILTON, *Circuit Judges*.

WILLIAMS, *Circuit Judge*. Petitioner Levell Taylor ("Taylor") was convicted of murder in Illinois state court and sentenced to 35 years' imprisonment. In this habeas appeal, Taylor complains that his counsel operated under a conflict of interest by jointly representing him and his brother, Lowell Taylor ("Lowell"), during their simultaneous murder trials. Taylor argues that this conflict

adversely affected his attorney's representation because his lawyer refused to call certain exculpatory witnesses during Taylor's trial, fearing they would implicate his brother in the murder. In denying Taylor's request for postconviction relief, the Illinois Supreme Court concluded that Taylor's interests did not conflict with his brother's and relied upon a purported credibility finding by the postconviction trial court to conclude that any conflict did not adversely affect the performance of Taylor's attorney. His state-court remedies exhausted, Taylor filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 asserting that his trial counsel was ineffective under *Cuyler v. Sullivan*, 446 U.S. 335 (1980).

We conclude that the state court unreasonably applied *Sullivan* in holding that Taylor's interest in presenting exculpatory witnesses did not conflict with his brother's interest in preventing their inculpatory testimony from being admitted at his trial. Furthermore, the Illinois Supreme Court unreasonably determined that the trial court's bare rejection of Taylor's claim must have constituted an implicit credibility finding in Taylor's attorney's favor on the question of whether the conflict of interest actually influenced his decision to refrain from calling Taylor's witnesses. Because we have no factual findings to defer to on the question of whether the conflict of interest adversely affected Taylor's attorney's performance and the evidence in the record is ambiguous, we must remand the matter to the district court for an evidentiary hearing to determine whether the conflict of

interest between Taylor and Lowell adversely affected Taylor's lawyer's representation.

## I.  BACKGROUND

On August 11, 1996, Bruce Carter, Keith Baker, and other members of a gang from Chicago's west side traveled to a barbecue at a friend's house on Chicago's south side. After Carter parked his brother's car on the side of the house where the barbecue was held, Carter, Baker, and their fellow west side compatriots encountered around 13 members of a rival gang from Chicago's south side. The south side group included Petitioner Levell Taylor, his brother Lowell Taylor, and Duante Anderson. It wasn't long before a melee arose between the two groups in the front yard of the house. During the fracas, Anderson punched Carter in the face and both Carter and Baker were forced to the ground and repeatedly kicked. Carter's car windows were smashed. Eventually, Carter and Baker managed to escape their assailants and ran toward the front door of the house. Carter was shot as he ran and later died from his wounds.

In his initial statement to police officers who responded to the scene, Baker identified Lowell as the person who fired the gunshot that killed Carter. Police officers then transported Baker and his friends to the station for additional questioning. While being questioned at the station, Baker saw the police bring Taylor into the station. At that point, Baker told the officer that Taylor was the person who passed the gun to Lowell just before the shooting. Taylor, Lowell, and

Anderson were later charged with first-degree murder in connection with Carter's death.

Taylor, Lowell, and Anderson were jointly tried in the Circuit Court of Cook County; Taylor and Anderson were tried before the bench and Lowell before a jury. Taylor and Lowell were both represented by criminal defense attorney Raymond Prusak during their simultaneous trials. Prosecutors sought to hold Taylor liable for Carter's death under an accountability theory. Under Illinois law, a person may be held to account for the crime of another if he aids that other person in the commission of the offense with the intent to facilitate the offense's commission. 720 ILCS § 5/5-2(c). At trial, Baker testified that he saw Taylor hand a gun to Lowell immediately before Lowell shot Carter. On cross-examination, Baker admitted that he had two prior felony convictions as well as three other felony charges that were pending at the time of his testimony. Prosecutors also called Phillip Marshall, a member of the same gang as Taylor, to the stand at trial. In his grand jury testimony, Marshall testified that Taylor came to his house on the night of the shooting and told him that "he just got into it with some boys down the street and shot at them and stuff." But at trial Marshall recanted his grand jury testimony. According to Marshall's trial testimony, police officers had threatened to charge him with Carter's murder unless he implicated his fellow gang members. Marshall's grand jury testimony was read into the record as impeachment evidence.

Prusak defended both of his clients by attacking the State's evidence and arguing that the State failed to

demonstrate guilt beyond a reasonable doubt. Taylor and Lowell did not, however, put on any witnesses or present any other evidence. In his closing argument for Taylor, Prusak contended that the State's witnesses lacked credibility because they were convicted felons and also because they had been impeached.

The jury found Lowell guilty of first-degree murder. After the jury rendered its verdict, the trial court found Taylor guilty of first-degree murder and acquitted Anderson. Taylor was later sentenced to 35 years' imprisonment. Taylor appealed his conviction claiming that he was deprived of his right to effective assistance of counsel due to a conflict of interest in Prusak's joint representation of Taylor and his brother Lowell. The Illinois Appellate Court affirmed the judgment and Taylor declined to file a petition for leave to appeal this decision to the Illinois Supreme Court.

On November 15, 2001, Taylor filed a postconviction petition in state court and again asserted that Prusak's assistance was ineffective as a result of a conflict of interest arising out of the joint representation of Taylor and Lowell. In support of his contention, Taylor attached affidavits from various witnesses which stated that, before the start of trial, Michael Woods, Rufus Bingham, and Teddy Plummer visited Prusak's office and informed him that they were at the barbecue when Carter was murdered. In their affidavits, Woods and Plummer asserted that they told Prusak that they saw Lowell shoot Carter but they did not see Taylor hand

Lowell a gun.[1] Woods and Plummer asserted in their affidavits that upon receiving this information, Prusak stated that he could not call either witness at trial because their testimony would hurt Lowell's case.

The postconviction trial court held an evidentiary hearing on Taylor's claim. Taylor's mother, Joyce Parker, testified that she and her husband brought Taylor, Woods, Bingham, and Plummer to Prusak's office in February 1997. Parker testified that, after interviewing the witnesses, Prusak told her that he would not use the witnesses "because they would hurt Lowell's case."

Bingham also testified that he told Prusak that he saw Lowell shoot Carter but did not see Taylor hand Lowell a gun. Bingham stated that Prusak told him "the reason why he didn't need us at the time [is] because we would be a worser witness for Lowell." On cross-examination, Bingham acknowledged that he had five prior convictions (only one of which preceded Taylor's trial) and that he was a member of the same gang as Taylor. Bingham also stated that he told police that he witnessed Lowell shoot Carter and acknowledged that he did not mention anything about Taylor in his initial

---

[1] Plummer's affidavit stated that "I saw Levell take out a gun and fire it at the victim. His brother Levell did not hand his brother a gun and was not involved in a any [sic] fight." Plummer later testified at the postconviction evidentiary hearing that he did not recognize the typographical error in the first sentence quoted from the affidavit before signing it as he did not read it before signing it.

statement. Bingham stated that at the time of his questioning he was unaware that the police believed Taylor had handed a gun to his brother before Carter's murder.

Other witnesses for Taylor included Plummer and Taylor's former co-defendant, Anderson. Plummer testified that he informed Prusak that Taylor did not hand a gun to his brother and that Prusak responded that Plummer would "hurt both of his clients if [he] testif[ied]." Plummer admitted that he had incurred two felony convictions at the time of Taylor's trial. Plummer also acknowledged that he was a member of a street gang that was friendly with Taylor's. Plummer told police officers that Lowell shot Carter during initial questioning. He did not inform them that Taylor did not hand Lowell a gun, but he testified that he did not know at the time of his questioning that Taylor was under arrest for the shooting or accused of handing the gun to his brother. Anderson testified that Taylor did not hand Lowell a gun because Taylor was on the side of the house destroying Carter's car at the time of the shooting. Anderson did not speak with Prusak prior to trial on the advice of his attorney but was presented at the postconviction hearing to corroborate testimony of other witnesses.

Taylor testified on his own behalf at the postconviction hearing. According to Taylor, Prusak told him that he could not use his potential witnesses at trial "because they signed statements against my brother and if they come to court to testify on my behalf that they would hurt my brother." Taylor also stated that he told Prusak

that he was on the side of the house "busting out" Carter's windows at the time his brother shot Carter even though he told police he was two houses away when the incident occurred. He denied, however, telling Prusak that he smashed Carter's car windows using a gun. On cross-examination, Taylor acknowledged that he did not mention these witnesses to the Assistant State's Attorney who questioned him on the night of the murder.

Raymond Prusak was the State's only witness at the postconviction evidentiary hearing. Prusak rejected the notion that he labored under a conflict of interest in representing Taylor and Lowell. According to Prusak, "The trials were severed. They were going to be separate juries or one was going to take a bench trial. From the beginning we all knew that [Taylor] was going to have a bench trial because we all believed that the case against him was fairly weak." But on cross-examination, Prusak modified his position:

> [Taylor's Counsel]: Why did you not have the same jury for both defendants?
>
> [Prusak]: Because they had—THEY had a need to be severed as far as why.
>
> [Taylor's Counsel]: Why?
>
> [Prusak]: Because they needed separate triers of fact.
>
> [Taylor's Counsel]: Why?
>
> [Prusak]: Because there was a potential there that a jury shouldn't hear what Lowell had to say and what Levell had to say.

> [Taylor's Counsel]: You are saying that there was a potential conflict?
>
> [Prosecutor]: Objection.
>
> [Prusak]: If they had—
>
> The Court: Overruled. You may answer.
>
> [Prusak]: If they had the same trier of fact it would have been a conflict, yes.

Prusak acknowledged that he met with Taylor's witnesses but disputed the assertion that he rejected them because they would hurt Lowell's case. Prusak provided several alternative reasons for declining to call the witnesses Taylor presented. One explanation was that the weakness of the State's case against Taylor rendered the additional witnesses unnecessary. In Prusak's estimation, the State's only two witnesses tying Taylor and Lowell to the shooting, Marshall and Baker, suffered from credibility problems. As Prusak testified:

> So essentially there were two witnesses, one was a flipper, one stuck to his story but both of those witnesses had convictions. They were both gang members and they both had lied in the past and I felt that neither of them would be credible witnesses to support a first degree murder conviction.

Prusak's other rationale for refraining from calling Taylor's witnesses at trial was the putative witnesses' own credibility problems. Each potential witness, Prusak testified, had criminal convictions and would not make a good impression on the trial court. Prusak also men-

tioned inconsistencies among the witnesses' statements, Taylor's statement to police, and Taylor's account of events that he provided to Prusak. As an example, Prusak testified that Taylor told him that at the time of the shooting he was on the side of the house breaking out Carter's car windows with a gun. Similarly, the putative witnesses also told Prusak that Taylor was on the scene at the time of the shooting. However, in Taylor's initial statement to police, he stated that he was two houses away at the time of shooting. Prusak stated that such inconsistencies undermined the witnesses' credibility and stated that he would "be suborning perjury by putting that evidence on."

Given the weakness of the State's case and the credibility issues associated with Taylor's witnesses, Prusak stated that calling the witnesses at trial "would just be handing the State ammunition to lose a case" that he believed "was weak to begin with, which I thought we had a very good chance of winning and I didn't want to lose the chance of winning the case by calling witnesses who in my opinion were not credible."

Prusak testified that he visited Lowell in his lock-up after his jury began deliberations and "begged" him to testify that Taylor did not hand him the gun used to kill Carter. Prusak described the encounter in his testimony:

> [Prosecutor]: What was Lowell Taylor's response?
>
> [Prusak]: He shook his head, mumbled no and walked away from me. I explained to him that his jury was already out. It wouldn't have any impact on his case whatsoever. It may have an impact on

> his appeal later down the road. You know, the appellate court might look at it and say that he, that he made some sort of admission. As far as his jury was concerned there was nothing for them to consider anymore. They were already deliberating.

Prusak later explained: "And if I'm begging [Taylor's] brother in the lockup to testify I would have gladly have helped, taken help from anybody who would have come off the street and testified to say a good thing about that young man because I was trying to win his case." Weeks later, the postconviction trial court issued a brief two-paragraph ruling denying the petition. The Illinois Appellate Court subsequently affirmed the denial of the petition.

During the pendency of the appeal, the Illinois Attorney Registration and Disciplinary Commission ("ARDC") filed a complaint against Prusak charging him with improperly representing another set of co-defendants while operating under a conflict of interest. *In re Raymond L. Prusak*, 06 CH 0066, *available at* http://www.iardc.org (last visited June 24, 2013).[2] Eventually, the Illinois Su-

---

[2] According to the ARDC complaint, Prusak cross-examined an eyewitness to an armed robbery so as to solidify her identification of one of his clients, Corian White, while undermining her identification of his other client, Tracy Chambers. As the Illinois Appellate Court noted in its opinion reversing White's conviction regarding Prusak's cross-examination, "[t]he prosecution could not have done a better job of eliciting facts that

(continued...)

preme Court suspended Prusak from the practice of law pending his compliance with certain conditions including securing an experienced defense attorney mentor to supervise Prusak's handling of criminal cases. *In re: Raymond L. Prusak*, Ill. Sup. Ct., M.R. 22666 (eff. December 9, 2008), *available at* http://www.iardc.org (last visited June 24, 2013). As of June 24, 2013, Prusak remains unauthorized to practice law due to discipline. Illinois Attorney Registration & Disciplinary Commission of the Supreme Court of Illinois, LAWYER SEARCH, http://www.iardc.org/lawyersearch.asp. Taylor cited the ARDC complaint in his petition for leave to appeal to the Illinois Supreme Court, which was granted on January 28, 2009.

The Illinois Supreme Court affirmed the denial of Taylor's postconviction petition. *People v. Taylor*, 930 N.E.2d 959 (2010). The court applied the framework described in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), for evaluating purported violations of the Sixth Amendment arising out of conflicts of interest that were not raised at trial. The court quoted the *Sullivan* decision in holding that "[w]here, as here, a potential conflict of interest is not brought to the attention of the trial court, 'a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance.'" *Taylor*, 930 N.E.2d

---

(...continued)

supported her identification of defendant White, counsel's own client." *People v. White*, 842 N.E.2d 188, 192 (Ill. App. Ct. 2005).

at 971. In other words, the Illinois Supreme Court said, "a defendant must show that an actual conflict of interest manifested at trial. What this means is that the defendant must point to some specific defect in his counsel's strategy tactics, or decision making attributable to the conflict." *Id.* at 971-72 (citations and internal quotation marks omitted).

Using this analysis, the court found that Taylor "failed to establish an actual conflict of interest in the joint representation of himself and Lowell that adversely affected Prusak's performance at trial." *Id.* at 972. After noting that "the only alleged specific defect in Prusak's representation that [Taylor] attributes to the claimed conflict is that Prusak failed to call [Taylor]'s proffered witnesses," the court found that these witnesses "merely raised the *possibility* that the interests of [Taylor] and Lowell may diverge." *Id.* at 972. Put another way, "[t]he mere availability of a strategy that would have helped one criminal codefendant at the expense of another does not create hostility between their interests." *Id.*

The court also found that Taylor failed to establish an adverse effect on Prusak's performance. In rendering its holding, the court acknowledged the contradictory nature of the evidence presented by both sides "as to whether Prusak's decision not to call defendant's proffered witnesses was attributable to the alleged conflict of interest." *Id.* at 973. Because resolving this conflict "rested substantially on the credibility of the witnesses at the evidentiary hearing[,]" the court relied on the purported judgment of the circuit court which "evidently

found Prusak's testimony more credible." *Id.* In affirming the circuit court's alleged credibility determination, the Illinois Supreme Court relied on discrepancies among the testimony of Taylor and his purported witnesses. *Id.* at 973-74.

Taylor then filed a petition for federal habeas relief based upon Prusak's alleged conflict of interest. The district court denied the petition and concluded that the Illinois Supreme Court's decision was not contrary to, and did not involve an unreasonable application of, *Sullivan.* In rejecting Taylor's claim, the district court found that the Illinois Supreme Court had not unreasonably concluded that any conflict of interest in Prusak's joint representation did not affect his performance at Taylor's bench trial.

After denying the petition, the district court issued a certificate of appealability on the central question which we must now resolve: "[w]hether trial counsel's joint representation of Petitioner Levell Taylor and his co-defendant/brother, Lowell Taylor, violated Petitioner's constitutional right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution."

## II. ANALYSIS

Our assessment of Taylor's claim is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. Where, as here, a state court decides a constitutional claim on the merits, AEDPA

provides that a writ of habeas corpus will not issue unless the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts" in light of the evidence before the state court. 28 U.S.C. § 2254(d)(1)-(2). "When a state collateral review system issues multiple decisions, we typically consider the last reasoned opinion on the claim"—in this case, the opinion of the Illinois Supreme Court. *Woolley v. Rednour*, 702 F.3d 411, 421 (7th Cir. 2012) (internal quotation marks omitted).

The standard described in § 2254(d)(1) is a strict one. "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000) (emphasis in original). To establish his entitlement to habeas relief, Taylor "must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011). In evaluating the Illinois courts' analysis of Taylor's claim under section 2254(d)(1), we presume that the courts' factual determinations are correct unless Taylor rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "The standard is demanding but not insatiable . . . deference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell*, 537 U.S. 322 (2003)).

Courts employ a standard similar to § 2254(e)(1) to evaluate whether a state court decision rested upon an unreasonable determination of the facts. "Under § 2254(d)(2), a decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence." *Goudy v. Basinger*, 604 F.3d 394, 399-400 (7th Cir. 2010) (citing *Ward v. Sternes*, 334 F.3d 696 (7th Cir. 2003)).

Taylor's principal contention is that the Illinois Supreme Court unreasonably applied federal law and unreasonably determined the facts in light of the evidence in rejecting his claim that he was deprived of his Sixth and Fourteenth Amendment rights to effective assistance of counsel because his attorney labored under a conflict of interest. *See* U.S. Const. amend. VI, XIV.

Taylor's Sixth Amendment conflict-of-interest claim is governed by the framework described in *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and related cases. In *Sullivan*, the Supreme Court held that a defendant who raised no conflict of interest objection at trial must demonstrate that (1) the defendant's interests conflicted with those of a codefendant represented by the same attorney; and (2) the conflict "adversely affected his lawyer's performance." *Id.* at 348-49; *see also Mickens v. Taylor*, 535 U.S. 162, 171 (2002) ("[W]e think 'an actual conflict of interest' meant precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties"). Put another way, the defendant must show that his attorney was influenced by the conflict in making "basic strategic decisions" in a manner

adverse to the defendant. *See Wood v. Georgia*, 450 U.S. 261, 272 (1981). Unlike other forms of ineffective assistance claims, "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Sullivan*, 446 U.S. at 349-50.

Although the Illinois Supreme Court correctly identified the *Sullivan* analysis as the standard governing Taylor's claim, *Taylor*, 930 N.E.2d at 970-74, Taylor contends that the court unreasonably applied *Sullivan* and other Supreme Court case law in holding that his Sixth Amendment rights were not violated.

### A. The Illinois Supreme Court Unreasonably Applied *Sullivan* in Concluding that Taylor's Interests Did Not Conflict with Lowell's Interests

Taylor contends that the Illinois Supreme Court unreasonably applied federal law in finding that Taylor's interests did not conflict with Lowell's interests with respect to the selection of a defense at trial. In concluding that no such conflict existed, the Illinois Supreme Court unreasonably equated Prusak's common defense strategy with the absence of antagonism between the brothers' interests. The court noted that both Taylor and his brother denied their guilt, did not implicate the other person at trial, and that their attorney "vigorously cross-examined the State's witnesses, impeached their credibility, and argued that the State failed to meet its burden of proof beyond a reasonable doubt." *Taylor*, 930 N.E.2d at 972. With respect to Taylor's potential defense based upon his

proffered witnesses, the court found that "[a]t most, defendant's proffered witnesses merely raised the *possibility* that the interests of [Taylor] and Lowell may diverge. . . The mere availability of a strategy that would have helped one criminal codefendant at the expense of another does not create hostility between their interests." *Id.* (emphasis in original).

In analyzing this aspect of Taylor's claim, the Illinois Supreme Court failed to recognize that a common defense for two clients does not necessarily demonstrate the absence of a conflict between their interests. To be sure, the Supreme Court has recognized that the interests of two or more defendants can be served by their shared attorney's pursuit of a single defense strategy. *Holloway v. Arkansas*, 435 U.S. 475, 482-83 (1978) ("'A common defense often gives strength against a common attack'" (quoting *Glasser v. United States*, 315 U.S. 60, 92 (1942) (Frankfurter, J. dissenting))). But this is not always the case. The presentation of a united front may not be consistent with one defendant's interest if it requires the abandonment of a plausible defense that benefits him at the expense of his codefendant. *See Sullivan*, 446 U.S. at 350 (remanding for consideration of whether petitioner's counsel labored under conflict of interest when deciding against presenting defense in order to protect codefendants' interests); *see also Glasser v. United States*, 315 U.S. 60, 72-73, 75-76 (1942) (finding defendant denied effective assistance when his attorney declined to cross-examine government witness for fear of prejudice to codefendant).

In order to determine whether the brothers' interests were both served by the pursuit of a common defense, the court must evaluate the strength of the putative defense discarded by his attorney and whether its presentation would harm the interests of a codefendant represented by the same attorney. *See Holloway*, 435 U.S. at 490 ("[I]n a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing. . . ."). Specifically, the court must determine whether the defense presented a plausible alternative to the strategy actually pursued at trial. *See, e.g., Griffin v. McVicar*, 84 F.3d 880, 887 (7th Cir. 1996) ("The test for conflict between defendants is not whether the defenses actually chosen by them are consistent but whether in making the choice of defenses the interests of the defendants were in conflict" (quoting *United States ex rel. Gray v. Director, Dept. of Corrections*, 721 F.2d 586, 597 (7th Cir. 1983))). The abandoned defense need not be a winning one; to suggest otherwise would run contrary to the Supreme Court's prohibition against "indulg[ing] in nice calculations as to the amount of prejudice attributable to the conflict" when evaluating conflict of interest claims. *Sullivan*, 446 U.S. at 349 (internal quotation marks omitted). Without an assessment of the discarded defense and its relationship to his brother's interests, the court could not determine whether or not Taylor's interests were at odds with Lowell's in the context of choosing a defense to pursue at trial.

The Illinois Supreme Court unreasonably declined to perform any analysis of Taylor's potential defense in

assessing his Sixth Amendment claim. If it had, the court would have arrived at the inescapable conclusion that Taylor's potential strategy was sufficiently plausible such that his interests were at odds with those of his brother in deciding whether to pursue a unified assault on the State's evidence. Undisputed evidence at the postconviction evidentiary hearing revealed that three eyewitnesses to the fight, Bingham, Plummer, and Woods, met with Prusak. Each witness told Prusak that they would testify that they saw Lowell shoot Carter but did not see Taylor hand Lowell a gun. These witnesses would have refuted the State's only evidence connecting Taylor to the crime by contradicting testimony that Taylor provided his brother with the murder weapon.

Furthermore, Taylor's interest in presenting his exculpatory witnesses was directly at odds with his brother's interest in excluding their testimony. Undisputed evidence demonstrates that each of Taylor's putative witnesses would have testified that they witnessed Lowell fire the shot that killed Carter. As Prusak was aware, two of the witnesses, Bingham and Plummer, had spoken to police during their initial investigation and, consistent with their proffered testimony, had told the authorities that Lowell shot Carter. These prior consistent statements to police identifying Lowell as the shooter only enhanced the danger that their testimony posed to Lowell. Although the potential prejudice to Lowell may have been slightly lessened by the fact that he and his brother had simultaneous trials before separate triers of fact, *Sullivan*, 446 U.S. at 347, this procedural maneuver did not eliminate the potential harm. Any witness that Taylor called in his

proceeding would have been made available instantly to the prosecution for use in Lowell's trial. Indeed, the Supreme Court in *Sullivan* recognized that such a severance does not automatically cure a conflict of interest between codefendants. *Id.* at 338-39, 350 (remanding for consideration of conflict when defendant's attorney testified that he did not put on witnesses "because I thought we would only be exposing the [defense] witnesses for the other two trials that were coming up").

Prusak himself conceded that the brothers had divergent interests with regard to their defenses. When asked why he felt the need to have his clients tried before separate finders of fact, Prusak responded that the procedural maneuver was necessary "[b]ecause there was a potential there that a jury shouldn't hear what Lowell had to say and what Levell had to say." Prusak's justification demonstrates his recognition that any attempt to exonerate Taylor through testimonial evidence would necessarily harm Lowell's interests.

By failing to consider the strength of Taylor's defense and its relationship to Lowell's interests, the Illinois Supreme Court unreasonably applied Supreme Court precedent requiring examination of the proverbial road not taken to determine whether a conflict of interest existed between codefendants with shared representation. *Holloway*, 435 U.S. at 489-90 ("Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing"). The brothers' interests clearly were at odds because Taylor's witnesses constituted a potentially successful defense strategy for Taylor but

posed a significant threat to Lowell's case at trial. In concluding that Taylor's interests were harmonious with Lowell's, the Illinois Supreme Court reached a conclusion that "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87.

### B. Illinois Supreme Court's Adverse Effect Decision Was Based on an Unreasonable Determination of the Facts

Even though Taylor's interests were contrary to those of his brother Lowell, because Taylor did not register a conflict-based objection at trial he must show that "an actual conflict of interest adversely affected his lawyer's performance" in order to establish a Sixth Amendment violation. *Sullivan*, 446 U.S. at 348. In other words, *Sullivan* requires Taylor to show that Prusak's refusal to call his witnesses was in fact caused by a desire to protect Lowell's interests. *See Burger v. Kemp*, 483 U.S. 776, 784-85 (1987).

Taylor contends that the Illinois Supreme Court's conclusion that the conflict of interest between Taylor and Lowell did not adversely affect Prusak's performance "was based on an unreasonable determination of the facts in light of the evidence" in that it ignored the clear and convincing weight of the evidence before the court. 28 U.S.C. § 2254(d)(2); *Goudy*, 604 F.3d at 399-400.

The Illinois Supreme Court concluded that Taylor could not show an adverse effect on Prusak's representation

because the decision to refrain from calling Taylor's witnesses was based upon strategic considerations unrelated to the conflict of interest between Taylor and Lowell. *Taylor*, 930 N.E.2d at 972-74. The Illinois Supreme Court concluded that Prusak decided against presenting Taylor's witnesses because, "in his professional judgment, they were weak witnesses," and because he thought that Taylor would be better served by simply attacking the sufficiency of the State's evidence. *Id.* Because Prusak's rationale did not implicate the competing interests of the two brothers, the court held that Taylor could not establish a violation of his Sixth Amendment rights. *Id.* at 974.

In evaluating this part of Taylor's claim, the Illinois Supreme Court relied upon the postconviction trial court's purported implicit factual finding that Prusak rejected the three witnesses for strategic reasons unrelated to the conflict of interest between Taylor and Lowell. *Id.* at 973-74. The court acknowledged that the postconviction trial court made no explicit factual finding but noted that the conflict of interest inquiry requires a factual determination "of specific defects in the representation" such that "the circuit court necessarily had to base its ruling on the specific circumstances of this case[.]" *Id.* at 970. Here, "the testimony at the evidentiary hearing was contradictory, setting up a question of fact as to whether Prusak's decision not to call defendant's proffered witnesses was attributable to the alleged conflict of interest." *Id.* at 973. Given that resolution of this issue "rested substantially on the credibility of the witnesses at the evidentiary hearing[,]" the court concluded

that "the circuit court evidently found Prusak's testimony more credible" and rejected Taylor's Sixth Amendment claim based solely on this credibility finding. *Id.*

Taylor challenges the Illinois Supreme Court's finding that the postconviction trial court made an implicit credibility determination accepting Prusak's explanation for his refusal to present Taylor's witnesses. For purposes of collateral review, we must defer to the Illinois Supreme Court's characterization of what the postconviction trial court found unless the petitioner presents clear and convincing evidence to overcome that presumption. 28 U.S.C. § 2254(e)(1); *Parker v. Dugger*, 498 U.S. 308, 320 (1991) (holding that a state appellate court's "determination of what the trial judge found is an issue of historical fact" entitled to appropriate deference under § 2254); *Wright v. Walls*, 288 F.3d 937, 944 (7th Cir. 2002) ("[A] reviewing court's characterization of what the trial judge found is one of historical fact").

The postconviction trial court's decision rejecting Taylor's claim was exceedingly brief:

> This case is up for a ruling. It's been continued about thirty some times, and I have reviewed the transcripts on several occasions, the Appellate opinion, the motion presented by the attorneys. We also had a hearing where Mr. Prusak testified, and I considered all that in determining whether or not the petition has any merit.
>
> After considering all the evidence, the testimony, and the arguments of the lawyers, this Court, it is

the Court's opinion that Mr. Taylor did not re-
ceive any substantial deviation of his constitu-
tional rights, and therefore the PC petition is
hereby denied.

The trial court's two-paragraph-long oral decision
presents no indication of an implicit credibility finding.
The ruling contains no mention of the word "credibility"
nor includes any language suggesting a comparison of
the believability of either side's account of the facts sur-
rounding Prusak's representation of Taylor. The trial
court cites no facts and does not describe the legal princi-
ples it applied in rejecting Taylor's claim. Although the
court mentions that it held a hearing in which Prusak
testified, this reference appears only in the context of the
trial judge's description of the types of evidence he con-
sidered. Standing alone, such a sparse decision devoid
of factual matter cannot support the Illinois Supreme
Court's determination of an implicit credibility finding.

Moreover, the Illinois Supreme Court unreasonably
assumed that the trial court necessarily found that Prusak
testified credibly when it rejected Taylor's claim. Recall
that in order to establish a violation of his Sixth Amend-
ment rights under *Sullivan*, Taylor had to show: (1) his
interests and those of his brother were in conflict; and
(2) the conflict adversely affected Prusak's performance.
*Sullivan*, 446 U.S. at 349. Under these circumstances, a
rejection of a *Sullivan* claim can mean one of three things:
(1) a petitioner has not shown that his interests diverged
from those of a codefendant represented by the same
attorney; (2) a petitioner cannot demonstrate an adverse

effect regardless of whether a conflict existed; or (3) a petitioner has shown a conflict of interest but his claim still fails because he cannot demonstrate an adverse effect. A mere denial of a *Sullivan* claim, without some indication of the grounds upon which it is based, cannot support an inference that the court relied solely upon a lack of adverse effect.

The arguments of the parties at the evidentiary hearing also demonstrate the problematic nature of the Illinois Supreme Court's assumption. Although the Illinois Supreme Court believed that the dispute before the postconviction trial court solely revolved around the "adverse effect" portion of the *Sullivan* inquiry, this was not the only contested issue at the hearing. The parties also presented conflicting evidence and argument concerning whether the respective interests of the brothers were at odds. Given the two-pronged nature of the *Sullivan* test and that the parties contested both the threshold conflict of interest condition and the "adverse effect" dependent necessary condition, the trial court's unadorned denial of the claim cannot support an implied factual finding on the "adverse effect" issue. Under the circumstances, we conclude that the Illinois Supreme Court incorrectly found that the trial court made a credibility finding in concluding that Prusak's representation was not adversely affected by the conflict of interest between Taylor and Lowell.[3]

---

[3] This case presents an entirely different set of circumstances than that confronting the Supreme Court in *La Vallee v. Delle*

(continued...)

---

(...continued)

*Rose*, 410 U.S. 690 (1973) (per curiam). In that case, the state trial court conducted an evidentiary hearing regarding the voluntariness of a defendant's confessions and after an "extensive[] summar[y]" of the conflicting evidence concluded, "that the respective confessions to the police and district attorney were, in all respects, voluntary[.]" *Id.* at 690. The Second Circuit granted habeas relief because the state court failed to make a credibility finding without which "it could not tell whether the state courts credited [petitioner's story of coercive methods used to obtain his statements] but still held these to have been voluntary, a conclusion to which we would not agree," or permissibly credited evidence to the contrary and found the confession to be voluntary. *Id.* at 694. The Supreme Court reversed, concluding that "it can scarcely be doubted from its written opinion that respondent's factual contentions were resolved against him." *Id.* at 692. The Court reminded federal habeas courts that they are to presume "that the state trier of fact applied correct standards of federal law to the facts" and could not mistake silence for legal error. *Id.* at 694.

Unlike here, the claim in *Delle Rose* concerned one discrete issue: whether the statements were given voluntarily or not. When competing testimony is presented on a single issue decided in the government's favor, a federal habeas court can imply a credibility finding in favor of the government from the state court's decision. Here, however, the resolution of Taylor's claim required resolution of two issues that were both contested at the trial court level. In addition, we are not concerned with whether the postconviction court applied the incorrect standard in resolving Taylor's claim; we simply cannot discern the part of the proper framework upon which the court based its ruling. Moreover, the state trial court in

(continued...)

Nor can we accept the alternative contention that the Illinois Supreme Court made an appellate credibility finding in Prusak's favor. A federal habeas court must accord deference to findings of fact made by state appellate courts. *See Sumner v. Mata*, 449 U.S. 539, 545-46 (1981); *Miranda v. Leibach*, 394 F.3d 984, 999-1000 (7th Cir. 2005). But in this case the Illinois Supreme Court expressly disclaimed making any credibility finding and instead relied on a purported implicit credibility finding by the postconviction trial court. As the Illinois Supreme Court stated in its opinion,"[c]redibility is not, of itself, a question for a court of review . . . [r]ather, in a postconviction evidentiary hearing, the circuit court, which saw and heard the witnesses, is in a better position than a reviewing court to engage in fact-finding and credibility determinations." *Taylor*, 930 N.E.2d at 973 (internal quotation marks and citations omitted). Pursuant to this analytical framework, the Illinois Supreme Court refrained from making its own credibility findings and limited its review to the postconviction trial court's decision. *See id.* ("Indeed, the circuit court's credibility determination is particularly justified. . . ."). Furthermore, the fact that the Illinois Supreme Court rejected Taylor's invitation to perform de novo review of the facts lends

(...continued)

*Delle Rose* provided a lengthy discussion of the relevant evidence and explained the legal ground on which it based its decision to alleviate any doubt as to the basis for its decision. The postconviction trial court's decision contains no such discussion.

additional support to our conclusion. *Id.* at 970. Instead, the court performed manifest error review of the trial court's decision, a standard that requires the reviewing court to refrain from "substitut[ing] its judgment for that of the trial court regarding the credibility of witnesses." *People v. Deleon*, 882 N.E.2d 999, 1005 (Ill. 2008); *see also Wrinkles v. Buss*, 537 F.3d 804, 818 (7th Cir. 2008) (finding that Indiana Supreme Court made no factual finding when the court declined to "say it was engaging in a *de novo* re-weighing of the evidence"). Under the circumstances, we are convinced that the Illinois Supreme Court did not make an appellate credibility finding on the question of Prusak's motivation for refusing to call Taylor's witnesses.

In light of the above, we conclude that the Illinois Supreme Court's decision on the adverse effect question, as it was based solely on a non-existent credibility finding by the postconviction trial court, was based on an unreasonable determination of the facts in light of the record. 28 U.S.C. § 2254(d)(2). The Illinois Supreme Court had no factual findings before it that would support its conclusion that Prusak's performance did not suffer as a result of the conflict of interest between Taylor and Lowell. Furthermore, the Illinois Supreme Court did not perform an independent evaluation of the evidence. We therefore find that the Illinois Supreme Court's determination was not supported by the clear and convincing weight of the evidence before it. *See Goudy*, 604 F.3d at 399-400.

## C.   District Court Must Determine Whether Conflict of Interest Adversely Affected Prusak's Performance

Even though the Illinois Supreme Court's decision unreasonably applied Supreme Court law in finding no conflict of interest and rested its adverse effect analysis upon an unreasonable factual determination, the question of whether Prusak's performance was adversely affected by the conflict remains unresolved. Despite holding an evidentiary hearing, the Illinois postconviction trial court refrained from making any findings of fact on the adverse effect question that would provide a basis for deference. This factual void then found its way into the Illinois Supreme Court's opinion. Without such a finding, we are left with an ambiguous record that precludes our independent determination of this pivotal question. In these circumstances, we simply cannot be certain whether or not Taylor is "in custody in violation of the Constitution or laws or treaties of the United States" and therefore entitled to habeas relief. 28 U.S.C. § 2254(a).

So we must remand this case to the district court for an evidentiary hearing on whether the conflict of interest between the two brothers adversely affected Prusak's performance. "A state court's mistake in summarily rejecting a petition, *i.e.*, without fully evaluating conflicting evidence on disputed factual issues, does not necessarily mean the petition is ultimately entitled to relief*." Mosley v. Atchison*, 689 F.3d 838, 842 (7th Cir. 2012). Instead, we must remand "in situations like these because the state court did not make a critical factual

finding to which we may defer." *Stitts v. Wilson*, 713 F.3d 887, 895-96 (7th Cir. 2013).

Such a result is consistent with the Supreme Court's decision in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011), which held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 1398. Indeed, Justice Breyer recognized that an evidentiary hearing would be necessary in a circumstance similar to that present in this case:

> [I]f the state-court rejection rested on only one of several related federal grounds (*e.g.,* that counsel's assistance was not "inadequate"), then, if the federal court found that the state court's decision in respect to the ground it decided violated (d), an (e) hearing might be needed to consider other related parts of the whole constitutional claim (*e.g.,* whether the counsel's "inadequate" assistance was also prejudicial).

*Id.* at 1412 (Breyer, J., concurring in part and dissenting in part).

On remand, the district court should conduct an evidentiary hearing to determine whether the conflict of interest adversely affected Prusak's representation of Taylor such that Taylor's Sixth Amendment right to counsel was violated. If the evidence shows that Prusak refrained from presenting Taylor's witnesses for fear that the State would call them at Lowell's jury trial, then Prusak would have labored under an actual conflict of interest in violation of Taylor's Sixth Amendment rights. If, however, Prusak made this decision based upon his

evaluation of the witnesses' credibility and their value to Taylor's case and without regard to their potential harm to Lowell's interests, no constitutional violation would have occurred.

### III.  CONCLUSION

For the above-stated reasons, we REVERSE the district court's denial of Taylor's petition and REMAND for further proceedings consistent with opinion.