# Illinois Official Reports

## Supreme Court

*People v. Nelson*, 2017 IL 120198

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MIESHA NELSON, Appellant. |
| Docket No. | 120198 |
| Filed | June 15, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Lawrence E. Flood, Judge, presiding. |
| Judgment | Appellate court judgment affirmed. Circuit court judgment affirmed. |
| Counsel on Appeal | Michael J. Pelletier, State Appellate Defender, Patricia Mysza, Deputy Defender, and S. Emily Hartman, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant. |
| | Lisa Madigan, Attorney General, of Springfield, and Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Eric Leafblad, Assistant State's Attorneys, of counsel), for the People. |

Justices             JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Freeman, Thomas, Kilbride, Garman, and Theis concurred in the judgment and opinion.

## OPINION

¶ 1      Defendant, Miesha Nelson, and her three codefendants, Carmelita Hall, Tiffany Cox, and Rosalinda Ball, were tried jointly but in severed bench trials for the armed robbery and stabbing death of Morris Wilson. All four defendants were found guilty. On appeal, defendant contended that she was denied her sixth amendment right to conflict-free counsel where attorneys from the same law firm represented defendant and codefendant Hall and defendant's attorneys, in making their choice of defenses, decided to forgo asserting an innocence defense in favor of pursuing a joint defense of self-defense. The appellate court rejected this contention and affirmed defendant's convictions. 2015 IL App (1st) 132157-U. For the reasons that follow, we affirm the judgment of the appellate court, but on different grounds.

¶ 2                               BACKGROUND

¶ 3      In February 2009, Morris Wilson was found beaten and stabbed to death in the courtyard of an apartment building located at 8147 South Drexel Avenue in Chicago. Defendant, Miesha Nelson, Tiffany Cox, Rosalind Ball, and Carmelita Hall, were charged with five counts of first degree murder and one count of armed robbery in connection with Wilson's death. Defendant was represented by Richard Kling and Susana Ortiz, both from the Law Offices of Chicago-Kent College of Law. Hall was represented by Daniel Coyne, also from the Law Offices of Chicago-Kent.[1]

¶ 4      The Cook County circuit court conducted severed but simultaneous bench trials. The following evidence was adduced at defendant's trial. The State first presented the testimony of five eyewitnesses, three of whom lived in the building at 8147 South Drexel Avenue. Their testimony was generally consistent and relayed that on February 1, 2009, at approximately 2 a.m., a young African-American man was repeatedly beaten by four African-American women in the courtyard. While the man lay on the ground, one of the women stabbed him as the others continued to beat him. At some point, one of the women removed the man's jacket and searched it. Thereafter, the four women left the courtyard.

¶ 5      Chicago police officer Michael Dearborn was the first to arrive at the scene. At trial, he testified that he observed blood on the sidewalk leading to the courtyard and in the snow. After entering the courtyard, he saw a man, later identified as Wilson, lying on the ground. Wilson was not responsive, was not breathing, and had blood on his face. Dearborn called for emergency personnel and secured the scene. On cross-examination, Dearborn stated he found a cell phone charger lying near Wilson's head and a "shiny object" on the ground near Wilson's body. A piece of a glass liquor bottle was also recovered from the scene.

---

[1]Because this case was originally a capital case, these attorneys were appointed by the court under the now repealed Capital Crimes Litigation Act. 725 ILCS 124/5 (West 2008).

¶ 6        Chicago police officer Cleveland Jones testified that he was en route to a domestic dispute call when he saw four women, whom he identified in court as the four defendants, walking in a single file from the 8100 block to the 8200 block on Drexel Avenue. The women drew his attention because they were underdressed for the weather. While dealing with the domestic dispute, Jones monitored a radio call about a man down at 8147 South Drexel Avenue. Jones then drove to that address.

¶ 7        Upon arrival, Jones observed Wilson's body on the ground and saw he was unresponsive and had blood on his face and clothing. Jones saw a trail of blood from Wilson's body to the sidewalk. Jones followed the blood trail to the sidewalk out of the courtyard and south on Drexel Avenue. At the northeast corner of 82nd Street and Drexel Avenue, where he had previously seen the four women, he observed a pile of clothing and a knife sticking out of the snow. He continued to follow the trail of blood, crossed 82nd Street, and ended up in front of an apartment building at 8207 South Drexel Avenue. Jones then observed the same four females he had seen earlier standing in a second-floor window, looking down at him. Jones returned to the courtyard complex to inform Chicago police officers West, Gaines, and Pickens that he might know where the suspects were.

¶ 8        The four officers returned to 8207 South Drexel Avenue, where Jones again observed the four women still standing in the window. At trial, Jones identified these four women as the defendants. Officers Gaines and Pickens went to the rear of the apartment building while Jones and West remained at the front. Jones and West went through a gate in front of the building, and Jones noticed a trail of blood continued to the front door. Upon entering the building, they went to the second floor and observed broken glass in front of the door. The glass appeared to match the glass found near Wilson's body. Jones knocked, and when Cox opened the door, he arrested her.

¶ 9        Officer Pickens testified at trial. He confirmed that he went with the other officers from the courtyard complex to 8207 South Drexel Avenue, that he observed four women looking out the window, and that he and Officer Gaines went to the rear of the apartment. Pickens testified when they got there, they observed three females and a male with a young child going from the second floor to the third floor. The three women were the same women he observed in the window earlier. Pickens identified all four defendants in court as the four women he saw in the window and defendant, Hall, and Ball as the three women he observed in the rear of the building. Pickens and Gaines arrested the three women and returned them to the second-floor apartment. Cox was in the apartment under arrest. The officers then returned to 82nd Street and Drexel Avenue with the women and turned them over to other officers, who transported them to the police station.

¶ 10        Evidence technician William Jackson collected and preserved evidence from the two scenes. He took photographs and videotapes of both scenes, which he identified in court and described. He recovered blood evidence and broken glass from 8147 South Drexel Avenue. He recovered blood evidence, a jacket, and a knife at the corner of 82nd Street and Drexel Avenue. Lastly, he recovered blood in the stairway leading to the second floor at 8207 South Drexel Avenue, broken glass in front of the apartment door, blood near the couch, and blood from the kitchen garbage container.

¶ 11        The parties then stipulated: (1) Wilson's and Hall's DNA were recovered from the knife, (2) Wilson's DNA was on a pair of green pants recovered from Cox, (3) Wilson's and Ball's

DNA were on a pair of jeans recovered from Ball, (4) Cox's DNA was on Wilson's jacket, (5) Wilson's and Hall's DNA were on defendant's hand, and (6) blood recovered from the sidewalk and Cox's apartment belonged to Hall. The parties also stipulated that the medical examiner's report found the cause of Wilson's death was multiple stab and incision wounds.

¶ 12   The State's next witness was emergency room physician Dr. Melissa Urides, who treated Hall for injuries to her hand on February 1, 2009. Her testimony was admitted in defendant's case as a statement against penal interest under Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011). Urides stated, in pertinent part:

"The patient [Hall] is a 25 year old black female who comes to the emergency room in police custody with a chief complaint today of a cut finger.

The patient claims she cut her first finger as well as her right, second and third digits [while] in a fight. The patient[ ] states she cut herself with a knife. She said she was stabbing someone.

\*\*\*

Apparently, she was involved in an altercation with four other women and one gentleman."

¶ 13   Detective Nannette Ansley then testified that on February 1, 2009, at approximately 2:35 p.m., she, along with Assistant State's Attorney Scott Clark, conducted a videotape interview of defendant. Ansley authenticated the video, which was then played in court.

¶ 14   In this videotaped interview, defendant stated she, Cox, Ball, Hall, and Wilson bought a fifth of gin and went to Cox's apartment to hang out. The four women began arguing with each other. Defendant asked Wilson to fix her broken cigarette, and after he did, he tried to smoke it. Defendant took the cigarette back from him, and according to defendant, "he kept talking crazy to us and then all of us was talking crazy to him." The women then told him to get out. They pushed him out into the hall, but he tried to push his way back into the apartment. Defendant and Hall grabbed empty glass liquor bottles from a garbage can. Defendant threw her bottle at Wilson as he walked down the stairs. The bottle hit him in the face but did not break. Wilson came back upstairs and threw the bottle back. The women again threw the bottle at Wilson. He again threw the bottle back, and this time, it broke when it hit Cox's apartment door. Defendant said Wilson told them he was going to "beat our ass" as he left the apartment.

¶ 15   Defendant stated Hall had two cell phones and they thought Wilson had taken one of them. Hall was apparently in the kitchen crying, "He have my phone. He have my phone." Defendant went into the kitchen, at which time Hall stated "I'm gonna go out there and get my phone." According to defendant, "We were like no, we tried to tell her don't go out there cause he might try to beat us up." Defendant then grabbed a knife from the kitchen. The women started to exit Cox's apartment, and Hall grabbed the knife from defendant. All four women then left the apartment. Once downstairs, defendant stated, she told the others they should not follow Wilson, but Ball was already down the street so they all followed.

¶ 16   According to defendant, once they got to 8147 South Drexel Avenue, Wilson tackled Ball, who was pregnant, so defendant grabbed Wilson and started hitting and kicking him. Defendant knew Hall had the knife but did not see it at that time because she was fighting. Defendant then stated all four women were hitting Wilson with their fists and feet. After a while, defendant saw Hall stab Wilson. All four continued to hit and kick Wilson. Defendant stated she grabbed Wilson's hood at one point so he could not get up. Defendant said she told

- 4 -

Hall, " ['M]an stop, let's go. C'mon, let's go.['] And then we get up to leave, he get up and he's like man, y'all stabbing me? And then [Hall] asked him where her phone was? And then he just fell." Defendant stated she tried to grab the knife from Hall while Hall was stabbing Wilson.

¶ 17    Defendant admitted she went through Wilson's pockets looking for Hall's cell phone but did not find it. She only found a phone charger, which she threw on the ground. Defendant removed Wilson's jacket and also threw it to the ground.

¶ 18    According to defendant, the women then returned to Cox's apartment. Defendant tried to get Hall's hand to stop bleeding, at which time Hall told her she had thrown away the knife. Defendant stated she never saw Wilson with a knife and never found any weapons in his pockets. Defendant also acknowledged Wilson was walking away when she and her friends went outside after him. Defendant stated that, when police came to the door, she grabbed Cox's daughter and went out the back with Hall and Ball.

¶ 19    Sergeant Dania Ward testified she transported defendant to the police station. Ward testified that defendant started talking to herself in the back of the car. According to Ward, defendant stated she was drinking and partying with her friends at an apartment and an argument ensued. Defendant said Wilson left and threw a glass bottle at the apartment door. Then, Hall grabbed a knife and said she was going to get him for what he had done. Defendant stated she told Hall, "[n]o, let's go beat him up." All four women then followed Wilson and beat him up. Defendant said she assumed Hall had the knife while they beat Wilson. They then fled.

¶ 20    At the conclusion of Ward's testimony, the State rested.

¶ 21    The defense then presented stipulated evidence pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), of Wilson's character that Wilson had struck his mother, two former girlfriends, and a man named Roger Smith, as well as evidence he yelled obscenities at and threatened to shoot a man named Gill Frazier. After the trial court confirmed defendant had knowingly waived her right to testify, defendant rested.

¶ 22    The State argued to the court in closing that the confrontation that took place inside Cox's apartment was over when Wilson left. All four defendants, the State maintained, then chased Wilson down and assaulted him. Further, according to the State, the evidence showed that three of the women, including defendant, kicked and struck Wilson, which aided and abetted Hall when she stabbed him. Accordingly, the State contended that each defendant was accountable for her codefendants' actions in the armed robbery and first degree murder of Wilson.

¶ 23    In response, defendant's counsel argued that the attack on Wilson occurred only because the women were protecting Bell after she had been tackled by Wilson. Thus, according to defendant's counsel, defendant acted in self-defense or defense of others. Counsel also argued that Wilson's act of pushing Ball down could have resulted in a sudden and intense provocation that would justify reducing the offense of first degree murder to second degree murder.

¶ 24    The circuit court found all four defendants guilty. In so ruling, the court found that the confrontation in Cox's apartment was over when Wilson left and that, after getting a knife from the kitchen, the four women pursued the victim. The court also found no evidence to support the defendant's contention that the women were merely coming to the aid of Ball after she had been tackled by Wilson. The court stated that none of the eyewitnesses to the incident

could corroborate that Ball was attacked and there was no physical evidence offered to support that version of events. The court also reviewed the law of accountability in Illinois and concluded that all four defendants were guilty of the armed robbery and first degree murder of Wilson. Following the denial of defendant's motion for a new trial, the court sentenced defendant to 25 years' imprisonment for murder and 7 years' imprisonment for armed robbery, to be served consecutively.

¶ 25    On appeal, defendant argued, in part, that her convictions should be reversed because her attorneys, who were part of the same clinic that represented codefendant Hall, labored under an actual conflict of interest. According to defendant, her statement to the police set out a plausible, alternative defense of actual innocence, based on a lack of accountability, which was hostile to Hall's defense of self-defense. Defendant maintained that her attorneys could have pursued this alternative defense but did not do so because they were constrained by their loyalty to Hall.

¶ 26    The appellate court concluded defendant failed to show an actual conflict of interest and, thus, counsels' joint representation did not warrant reversal of defendant's convictions. 2015 IL App (1st) 132157-U, ¶ 27. In reaching its decision, the appellate court relied, in part, on the rule announced in *People v. Echols*, 74 Ill. 2d 319 (1978). 2015 IL App (1st) 132157-U, ¶ 27 (citing *People v. Powers*, 260 Ill. App. 3d 163, 170-73 (1994)). In *Echols*, this court held that the mere availability of a strategy that would have helped the defendant at the expense of a codefendant does not create hostility between the interests of the two. 74 Ill. 2d at 327-28.

¶ 27    We granted defendant's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015).

¶ 28                                    ANALYSIS

¶ 29    The sixth amendment right to effective assistance of counsel includes the right to conflict-free representation. *Holloway v. Arkansas*, 435 U.S. 475, 481 (1978); *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008). "For purposes of conflict of interest analysis, the law considers the representation of codefendants by law partners or associates the same as the representation of codefendants by one attorney." *People v. Mahaffey*, 165 Ill. 2d 445, 456 (1995). However, the mere fact of joint representation of multiple defendants does not create a *per se* violation of the right to effective assistance of counsel. *People v. Orange*, 168 Ill. 2d 138, 156 (1995) (citing *Holloway*, 435 U.S. at 482). Moreover, the Supreme Court has noted that, when joint representation is undertaken but the defendants are tried separately, it is less likely counsel will face a conflict. *Burger v. Kemp*, 483 U.S. 776, 784 (1987).

¶ 30    When, as here, a defendant does not raise a conflict of interest until after trial, the claim is governed by *Cuyler v. Sullivan*, 446 U.S. 335 (1980). *Sullivan* holds that, in order to establish a violation of the sixth amendment, a defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 348.

¶ 31    The appellate court, in rejecting defendant's contention that her attorneys labored under an actual conflict of interest, did not cite *Sullivan*. Instead, the court relied on the "well-established rule" in Illinois that "the mere availability of a strategy that would have helped one defendant at the expense of another does not create hostility between the interests of criminal defendants." 2015 IL App (1st) 132157-U, ¶ 27. That is, according to the appellate court, even assuming that defendant had a plausible, alternative defense that could have been pursued by her attorneys, that fact could not establish her interests were hostile to those of her

codefendant Hall. So long as there was a viable joint defense, the interests of codefendants were not hostile. Defendant asserts this categorical rule, which derives from *People v. Echols*, 74 Ill. 2d 319 (1978), is at odds with *Sullivan* and must be abandoned. In support, defendant points to the Seventh Circuit Court of Appeals decision, *Taylor v. Grounds*, 721 F.3d 809 (7th Cir. 2013).

¶ 32    In *Taylor*, defense counsel represented both the defendant and his brother at their severed but simultaneous jury trials. Defense counsel refused to call the defendant's proffered witnesses who would have testified that the defendant's brother was the only one involved in the shooting. Instead, counsel argued that the State had failed to prove either defendant's guilt beyond a reasonable doubt. Defendant subsequently filed a postconviction petition that raised a conflict-of-interest claim. The circuit court denied the defendant's petition following a hearing, and this court subsequently affirmed. See *People v. Taylor*, 237 Ill. 2d 356 (2010).

¶ 33    This court held that the defendant's proffered witnesses "merely raised the possibility that the interests of defendant and [codefendant] may diverge." *Id.* at 376. In finding that defense counsel's strategy of arguing reasonable doubt did not establish a conflict of interest under *Sullivan*, this court stated that "[t]he mere availability of a strategy that would have helped one criminal codefendant at the expense of another does not create hostility between their interests." *Id.* at 376-77.

¶ 34    At a subsequent *habeas corpus* proceeding in the same case, the Seventh Circuit Court of Appeals found this court's application of *Sullivan* to be an unreasonable application of clearly established federal law. *Taylor v. Grounds*, 721 F.3d at 818. The Seventh Circuit concluded that, in applying the *Echols* rule, this court "failed to recognize that a common defense for two clients does not necessarily demonstrate the absence of a conflict between their interests." *Id.* While it is true the interests of multiple defendants may be served by a common defense, this is not always the case. *Id.* at 818-19. "The presentation of a united front may not be consistent with one defendant's interest if it requires the abandonment of a plausible defense that benefits him at the expense of his codefendant." *Id.* at 819. The Seventh Circuit emphasized that Supreme Court precedent requires courts to "evaluate the strength of the putative defense discarded by his attorney and whether its presentation would harm the interests of a codefendant represented by the same attorney." *Id.* However, the *Echols* rule forecloses this inquiry. Further, according to the Seventh Circuit, without an assessment of the discarded defense and its relationship to the interests of the defendant's brother, it was impossible to "determine whether or not [defendant's] interests were at odds with [his brother's] in the context of choosing a defense to pursue at trial." *Id.* Thus, the Seventh Circuit concluded that this court had "unreasonably declined to perform any analysis of [defendant's] potential defense in assessing his Sixth Amendment claim." *Id.* If this court had, we "would have arrived at the inescapable conclusion that [defendant's] potential strategy was sufficiently plausible such that his interests were at odds with those of his brother in deciding whether to pursue a unified assault on the State's evidence." *Id.* The Seventh Circuit remanded to the district court for a determination of whether the conflict adversely affected counsel's performance. *Id.* at 824.

¶ 35    Relying on *Taylor v. Grounds*, defendant contends that the *Echols* rule is at odds with *Sullivan* and must be abandoned and, therefore, the appellate court's analysis in this case cannot be sustained. The State, in response, concedes that *Echols* is no longer good law.

¶ 36    This is the first time this court has been asked to address the continuing validity of *Echols* in light of *Sullivan*. Having considered the matter, we agree with the parties that the categorical rule of *Echols* cannot stand. As the Seventh Circuit observed, the *Echols* rule fails "to recognize that a common defense for two clients does not necessarily demonstrate the absence of a conflict between their interests." *Taylor v. Grounds*, 721 F.3d at 818. The rule does not take into account the fact that a conflict of interest may arise when defense counsel must make the choice of strategy or defense to pursue in representing defendant. Or, to put it another way, the *Echols* rule does not afford courts the opportunity to assess whether the interests of the codefendants *actually* are at odds with each other in a particular case and, therefore, whether a conflict of interest exists. The *Echols* rule is therefore in conflict with the *Sullivan* standard for establishing an actual conflict and must be overruled.

¶ 37    Having rejected the *Echols* rule, we must now consider whether defendant has established an actual conflict under *Sullivan*. In order to establish that an actual conflict of interest adversely affected counsel's performance, a defendant

> "[f]irst, *** must demonstrate that some plausible alternative defense strategy or tactic might have been pursued. He need not show that the defense would necessarily have been successful if it had been used, but that it possessed sufficient substance to be a viable alternative. Second, he must establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *United States v. Fahey*, 769 F.2d 829, 836 (1st Cir. 1985).

Thus, to determine whether defendant's and codefendant Hall's interests were hostile in this case, we first must evaluate the strength of the putative defense, if any, discarded by defendant's attorneys and determine whether its presentation would harm the interests of Hall. As the Seventh Circuit has stated, "[t]he presentation of a united front may not be consistent with one defendant's interest if it requires the abandonment of a plausible defense that benefits him at the expense of his codefendant." *Taylor v. Grounds*, 721 F.3d at 819.

¶ 38    Defendant contends that a plausible, alternative defense existed in this case that was at odds with Hall's self-defense strategy. Defendant asserts that, in her statement to police, she established that Hall suddenly and without explanation stabbed Wilson while he was on the ground, that defendant tried to stop Hall when she discovered Hall was stabbing Wilson, and that defendant did not know Hall intended to kill Wilson. From this, defendant asserts a defense of innocence based on a lack of accountability was of " 'sufficient substance to be a viable alternative' to self-defense." We disagree.

¶ 39    Section 5-2(c) of the Criminal Code of 1961 provides that a person is legally accountable for the criminal conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he [or she] solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2008). This statute incorporates the common-design rule. *People v. Terry*, 99 Ill. 2d 508, 515 (1984); *People v. Kessler*, 57 Ill. 2d 493, 496-97 (1974).

¶ 40    Under the common-design rule, if "two or more persons engage in a common criminal design or agreement, any acts in the furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts." *Kessler*, 57 Ill. 2d at 496-97. See also *People v. Fernandez*, 2014 IL 115527, ¶ 13; *In re W.C.*, 167 Ill. 2d 307, 337 (1995); *People v. J.H.*, 136 Ill. 2d 1, 17

(1990); *Terry*, 99 Ill. 2d at 514; *People v. Cole*, 30 Ill. 2d 375 (1964); *People v. Marx*, 291 Ill. 40, 48 (1919); *Hamilton v. People*, 113 Ill. 34 (1885). Where there is a common design to do an unlawful act, then "whatever act any one of them [does] in furtherance of the common design is the act of all, and all are equally guilty of whatever crime was committed." *People v. Tarver*, 381 Ill. 411, 416 (1942). Thus, a defendant may be charged with murder based on a theory of accountability where the defendant enters a common design to commit only a battery yet a murder is committed during the course of the battery. *Terry*, 99 Ill. 2d at 515. See also *Brennan v. People*, 15 Ill. 511, 516-17 (1854) (accomplice held liable for murder even without showing his intent to kill).

¶ 41 Defendant's own statement established that the four women left Cox's apartment to go after Wilson after the initial confrontation had ended and Wilson had left the building. Defendant admitted she was the one who initially grabbed the knife from the kitchen and was aware at all times during the incident that Hall was in possession of it. Defendant also admitted to physically attacking Wilson and grabbing his hood to hold him down. Thereafter, defendant went through Wilson's pockets and removed his jacket to search for Hall's phone. Defendant then returned with the others to Cox's apartment. At no time did defendant attempt to escape the incident or separate herself from the group or remove herself from the attack.

¶ 42 If the four codefendants' common design was to commit a criminal assault on Wilson, then it would not matter under Illinois law whether Hall "suddenly" stabbed Wilson during the attack or whether, at some point, defendant told Hall to stop and attempted to grab the knife. On this record, defendant is guilty of first degree murder under the common-design rule. See, *e.g.*, *People v. Phillips*, 2014 IL App (4th) 120695. Accordingly, defendant's proposed alternative defense was simply not available.

¶ 43 Based on the foregoing, we find defendant has failed to show that an innocence defense based on a lack of accountability was a plausible alternative defense. Accordingly, defendant has not shown an actual conflict of interest.

¶ 44                                              CONCLUSION
¶ 45 For the foregoing reasons, the judgments of the appellate and circuit courts are affirmed.

¶ 46 Appellate court judgment affirmed.
¶ 47 Circuit court judgment affirmed.