NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200637-U

NO. 4-20-0637

IN THE APPELLATE COURT

FILED
May 23, 2022
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| CYNTHIA MARIE BAKER, | ) | No. 19CF416 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John C. Costigan, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Turner and Holder White concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The appellate court affirmed, finding defendant was not denied the effective
            assistance of counsel.

¶ 2     Following a jury trial in November 2019, defendant, Cynthia Marie Baker, was

convicted of one count of first degree murder (720 ILCS 5/9-1(a)(2) (West 2018)), one count of

aggravated battery of a child (720 ILCS 5/12-3.05(b)(1) (West 2018)), three counts of domestic

battery (720 ILCS 5/12-3.2(a)(2) (West 2018)), and one count of endangering the life or health

of a child (720 ILCS 5/12C-5(a)(1) (West 2018)). Defendant filed a motion for new trial in

August 2020, which the trial court subsequently denied. In November 2020, the court sentenced

defendant to natural life imprisonment.

¶ 3        Defendant appeals, arguing she was denied the effective assistance of trial counsel and posttrial counsel. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        In September 2016, R.R. (born in April 2010) was removed from her mother's custody and placed with her father, Richard Roundtree. In December 2018, Roundtree entered into an informal agreement granting his then-girlfriend, defendant, temporary guardianship of R.R. That same month, defendant and Roundtree moved to their current residence, where they remained until R.R.'s death on January 26, 2019. She was eight years old.

¶ 6                                  A. The State's Charges

¶ 7        In April 2019, the State charged defendant with three counts of first degree murder (counts I-III) (720 ILCS 5/9-1(a)(1)-(3) (West 2018)), one count of aggravated domestic battery (count IV) (720 ILCS 5/12-3.3(a) (West 2018)), one count of aggravated battery of a child (count V) (720 ILCS 5/12-3.05(b)(1) (West 2018)), eight counts of domestic battery (counts VI-XIII) (720 ILCS 5/12-3.2(a)(2) (West 2018)), and two counts of endangering the life or health of a child (counts XIV-XV) (720 ILCS 5/12C-5(a)(1) (West 2018)). Count II alleged defendant, or one for whose conduct she was legally responsible, caused the death of R.R. by kicking her in the abdomen, knowing such act created a strong probability of death or great bodily harm.

¶ 8                                    B. Jury Trial

¶ 9        In November 2019, the matter proceeded to a jury trial. We reiterate only the facts necessary to reach our decision in this appeal.

¶ 10                                      1. *J.H.*

¶ 11        J.H. testified she was nine years old and previously attended school with R.R. She described R.R. as kind and intelligent. After moving in with Roundtree, R.R. told J.H. she "hated it there" because she "always got hurt" by defendant. J.H. testified R.R. seemed "much more sad and depressed," and she noticed "[a] lot" of injuries on R.R., including "a bump on her ear and a chipped tooth."

¶ 12                                2. *Mark Coates*

¶ 13        Lieutenant Mark Coates of the Normal Fire Department testified he was dispatched to defendant's address on January 25, 2019. Upon his arrival, Coates "observed [defendant], holding [R.R.] in her arms at the front door waiting on us." Coates stated, "[defendant's] demeanor through the whole call was remarkably calm." R.R. "was limp at the time, *** extremities down, head back," and Coates "instructed [defendant] to take [R.R.] back inside because the ambulance was behind us a bit." Once inside, "it became painfully obvious pretty quickly that *** [R.R.] was struggling to breathe and her heart [rate] was pretty slow too."

¶ 14                                3. *Matthew Johann*

¶ 15        Matthew Johann, a firefighter and paramedic employed by the Normal Fire Department, testified his ambulance was the second vehicle to arrive at defendant's home. After entering the residence, Johann observed the other firefighters addressing "a copious amount of emesis within [R.R.'s] airway," which "they were attempting to suction and clear *** with a manual suction device." R.R. was "unresponsive" and "apneic, which means you're not breathing and you're not producing a pulse which is what necessitated CPR." Johann testified R.R.'s condition "remained critical," and he continued to perform chest compressions in the ambulance while transporting R.R. to BroMenn Medical Center (BroMenn) in Normal, Illinois.

Johann stated R.R.'s stomach was "obtuse *** distended, bulging out," and not "in proportion to her stature."

¶ 16                                    4. *Penelope Sandiford*

¶ 17            Penelope Sandiford, an attending physician at OSF Children's Hospital of Illinois in Peoria (OSF), testified she treated R.R. in the early morning on January 26, 2019, following R.R.'s transfer from BroMenn. Sandiford testified, "as soon as [she] saw [R.R.'s] abdomen, it was obvious that there was something wrong." R.R.'s abdomen was "very rigid," which required a surgeon to assist Sandiford in diagnosing the problem. Following surgery, R.R. remained "critically ill, unstable," and her condition continued to decline. Shortly thereafter, R.R. was pronounced dead.

¶ 18                                    5. *Charles Aprahamian*

¶ 19            Without objection, the State called Dr. Charles Aprahamian as an expert witness in pediatric medicine. Aprahamian testified he was chief surgeon and a clinical assistant professor of surgery and pediatrics at OSF. Aprahamian testified R.R. "needed emergency surgery" after a computerized tomography scan showed "air outside of the bowel but inside her abdomen." During surgery, Aprahamian observed "blood and stool in [R.R.'s] abdomen." Additionally, "[t]here was an injury to the mesentery of the last part of the small [intestine]," which is the membrane that attaches the intestine to the abdominal wall, "[a]nd the colon on the right side *** had a hole in it." Aprahamian had "only ever seen that in blunt abdominal trauma" and a "[s]ignificant" degree of force, such as being struck in the stomach by an adult, would be necessary to cause the injury. "[B]ased on the amount of inflammation, spillage, and some of the other signs of edema in the abdomen," Aprahamian opined R.R.'s injury likely occurred within three to five days prior to her death.

¶ 20     On cross-examination, Aprahamian reiterated "the amount of inflammation that was there and the hole and the leaking of the intestines had gone on for at least days." Aprahamian further testified it was unlikely R.R.'s injuries occurred weeks before her death "because of the amount of blood in the abdomen and how sore *** someone gets with that."

¶ 21                    6. *John Scott Denton*

¶ 22     Dr. John Scott Denton, a forensic pathologist of the McLean County Coroner's office, testified as an expert in forensic pathology. He identified People's Exhibit Nos. E1 through E75 as the autopsy photographs taken over the course of his examination of R.R. Denton testified there were "conservatively *** about 50 different *** patterned scars and marks on [R.R.'s] body," and he observed "both recent and healing injuries." He further testified, "on the right side of [R.R.'s] abdomen there was a large healing bruise. It was about four inches in diameter that was full thickness and went all the way through the abdominal wall. *** There was a second bruise in her right groin," which was "similar." Denton identified People's Exhibit No. E64 as depicting an "area of [R.R.'s] intestines," which showed "a shaggy coating of *** peritonitis from inflammation that's on the surface of the bowel, which means her bowel did perforate." Denton concluded R.R.'s "cause of death as demonstrated in those injuries is peritonitis due to intestinal perforation due to blunt trauma of the right side of her abdomen," which was consistent with being "struck in the right lower abdomen by an adult." Denton also opined the injuries occurred "at least several days" before R.R.'s death. When asked to explain the basis of his opinion, Denton stated:

    "So the body repairs injuries in certain ways. So I take my findings together, so there's a bruise on her abdomen that's healing. So the skin surface is not as dark as the inside. So the bruise on the

surface that's healing, so that takes time, days at least, and the inner part takes longer to heal, that's darker. So the right side is healing, but it's still darker so that hemorrhage is not gone yet. That takes 10 days to about two weeks.

Then the scar tissue inside her mesentry [*sic*] where the intestines eventually perforated, scar tissue comes in about 10 days and sometimes healing is done about three weeks. So I would say *** 10 days to a couple of weeks is fair."

Denton further testified it was his medical opinion that "this is child abuse. This is repetitive injuries to a child over numerous I would say weeks."

¶ 23                                  7. *C.B.*

¶ 24          C.B. testified she was seven years old. She described defendant and Roundtree as her parents. C.B. testified defendant used a belt to discipline R.R. and would punish her for "[n]othing." C.B. also recalled defendant kicking R.R. "[m]ore than one time." C.B. testified defendant kicked R.R. in the stomach twice in the living room of the family's current residence. Defendant was seated "[o]n the big couch" while R.R. sat "[o]n the ground." C.B. explained "[defendant] didn't let [R.R.] *** on the couches" because she was not defendant's daughter. C.B. testified R.R. was "just sitting" and not misbehaving. Defendant kicked R.R., and R.R. "busted her head on the very top where the TV was." According to C.B., defendant "started laughing at [R.R.]" and kicked her in the stomach a second time.

¶ 25          On cross-examination, C.B. recalled being interviewed by Detective Kendra DeRosa but could not remember everything they spoke about. C.B. could not recall telling DeRosa she saw Roundtree punch R.R. in the stomach.

¶ 26                                    8. *Kendra DeRosa*

¶ 27          Kendra DeRosa, a juvenile detective with the Normal Police Department, testified she was one of the lead officers assigned to investigate R.R.'s death. DeRosa testified she contacted the McLean County Children's Advocacy Center and "coordinate[d] with them a time that would be appropriate for the remaining siblings to be interviewed at the center," including C.B. DeRosa also testified she interviewed defendant shortly after R.R.'s death, and she identified People's Exhibit No. 11A as a full, accurate, and complete transcription of that recorded interview. During the interview, defendant told DeRosa, "there's really no discipline in my home. There's *** just no discipline. I mean there's no consequences I should say." Defendant explained her definition of discipline as being "grounded, *** stood in the corner, phone taken away." Defendant stated, "I just don't ever hit kids. I don't like that." She further stated, "I don't physically do anything to them." Yet defendant admitted she "used the belt on [R.R.] one time," and she acknowledged she "smacked [R.R.] in the mouth." Defendant also told DeRosa, "yeah, I would smack 'em [*sic*] in the back of the head and use the belt, but I mean I don't—Ever since the new house I don't do—I don't touch them. I don't, I don't."

¶ 28          9. *Defendant's Closing Argument and the State's Rebuttal Closing Argument*

¶ 29          In his closing argument, defense counsel vigorously attacked the State's case as circumstantial. Despite conceding defendant was "100 percent guilty of every domestic battery [the State] charged her with," counsel implored the jury to consider "every piece of evidence" and not "make the leap they're asking you to do *** because of what you saw in videos, what you read in texts." Counsel argued "nothing in those videos is an aggravated battery. Nothing in those videos is murder." Counsel also requested the jury not "get confused by [Denton]

referencing every single thing he put a laser on as an injury, as trauma." Counsel asserted, "Kids fall, other kids scratch kids," and "[n]ot every injury means it's done by wrongdoing."

¶ 30        In rebuttal, the State asserted defendant "systematically and brutally abused [R.R.]" and suggested her injuries were "pattern injuries." The State remarked there were "loop scars, circular scars, bruises, some of which are completely healed, others that are still healing. There's also alopecia which is likely caused by this defendant grabbing the victim by the head and bouncing it off the wall." The State then showed the jury a selection of autopsy photographs, as well as a two-minute presentation which contained excerpts of previously admitted text messages and video clips taken from defendant's cell phone.

¶ 31        Prior to deliberations, the trial court provided instructions to the jury which included instructions on judging the credibility of the evidence presented. The court also informed the jury closing arguments were not to be considered evidence. Ultimately, the jury found defendant guilty of first degree murder, count II; aggravated battery of a child, count V; domestic battery, counts VI, VIII, and XII; and endangering the life or health of a child, count XV.

¶ 32                        C. Motion for a New Trial

¶ 33        In August 2020, defendant, through posttrial counsel, filed a motion for a new trial. On October 6, 2020, defendant amended her motion, alleging multiple claims of ineffective assistance of counsel. In relevant part, defendant alleged trial counsel "was ineffective for working with Richard Rountree [*sic*] instead of investigating him and using him as an alternate explanation of [R.R.]'s injury." Defendant's motion further asserted counsel failed to impeach C.B. with her prior statement, which she made during her interview with DeRosa, "that Richard Rountree [*sic*] had punched [R.R.] in the stomach with a closed fist."

¶ 34                                    1. *Defendant*

¶ 35         On October 9, 2020, the trial court held a hearing on defendant's amended motion for a new trial. Defendant testified she met with her trial counsel, Todd Ringel, "[f]ive times before [she] went to trial; six total." Defendant testified she brought up the possibility of Roundtree causing R.R.'s fatal injury "[e]very single time" she met with Ringel, but he "just kept reassuring [her] that we didn't want to blame Richard." According to defendant, Ringel "made Richard a promise that he would not blame him."

¶ 36         At one of her meetings with Ringel, defendant watched DeRosa's interview of C.B. Defendant recalled C.B. telling DeRosa Roundtree punched R.R. in the stomach before "stat[ing] in the interview that [defendant] kicked [R.R.] in the center of the stomach." Defendant claimed Ringel told her he "would use that as part of [her] defense because [DeRosa] did not ask any more questions to [C.B.] about Richard punching her in the stomach." Ringel advised defendant "he was not going to be able to approach C.B. aggressively like he would a normal witness because he had a child her age and he would not want anybody *** to do that to his child." Defendant also testified she informed Ringel that Roundtree "told [her] that he kicked [R.R.] in the stomach and that he was concerned that he may have caused the injury that caused [R.R.]'s death." When Ringel asked regarding "the timing of this," defendant responded, "[I]n November." At another meeting, defendant discussed "the Chicago trip" with Ringel. Defendant explained, "On the way up there we were all sleeping, and Richard was driving, and he slammed on the brakes and it woke me up." However, one day prior to defendant's trial, defendant claimed Ringel "told [her] that he did not think that the Chicago trip was going to—be able to use that as a defense."

¶ 37 On cross-examination, defendant admitted she directed Roundtree on how to discipline R.R. Defendant also alleged Roundtree "pinched [R.R.] all the time," and she acknowledged recording herself battering R.R. Defendant further admitted sending a letter to Roundtree from jail, which the State received from him following the close of its case-in-chief. Defendant identified the letter as People's Exhibit A. The letter read, in relevant part:

"This court s*** is not going the way we thought it would. I know you nor I did anything to cause this. But it has come down to either you or I doing time. *** I know you are stressed about this as well but I really need you to take the blame for this. Please just tell them in court that you kicked [R.R.]. I know the timing isn't right but you did kick her and that may have caused damage. *** I know this sounds cold hearted but when I hit [R.R.] with a belt, it didn't cause damage to her stomach. I just need you to tell them that you did do them [*sic*] things. You are a man, you can handle jail alot [*sic*] better than I can. *** I tried not to involve you in this knowing you are innocent as well but you promised me you wouldn't let me go down for this. *** We will refer to this letter on the phone as the 'lady.' You need to get rid of this ASAP and not in our trash. Please think of a story and get me out of this. *** This was really hard for me to write but I don't have any other option right now its [*sic*] this or life gone. *** Just please think about this and come up with something to get me out of here."

¶ 38                                      2. *Todd Ringel*

¶ 39        Ringel testified Roundtree "would come to [his] office religiously," and Ringel "would make it clear every time," he did not represent Roundtree. Ringel also "told [defendant] clearly" he needed to establish to Roundtree he was not his attorney. Ringel denied promising Roundtree he would not accuse him of R.R.'s murder. Rather, Ringel "told him the opposite," informing defendant "if any evidence comes up that puts the needle on [Roundtree] we're going to go after him." Ringel stated he "fully intended to get to the pinch marks through Richard himself ***, I was going to call him." However, upon the State's receipt of defendant's letter to Roundtree, Ringel "did everything [he] could to prevent the jury from learning of [it]." According to Ringel, that was why he "told [defendant] I cannot call Richard." Ringel explained "the jury would have inferred that [letter] as a person asking another person to take responsibility for something that they did, to go ahead and be willing to accept the blame." Ringel believed "the jury would take that letter as a confession," and he testified his trial strategy was to limit defendant's case and prohibit the State from presenting defendant's letter in any way. Ringel added, "If I had called Richard *** I was going to attempt to show it could have been *** Richard."

¶ 40        Ringel testified he investigated the information defendant gave him pertaining to Roundtree's alleged admission he may have caused R.R.'s fatal injury. Ringel further testified defendant informed him Roundtree "sent her a text message saying I think I hit her too hard. She made it clear that there would be days' worth of these messages," but Ringel was unable "to find a single one that even related to that subject matter." Ringel testified "that's the only thing she ever gave me, *** other than the car incident." Regarding the family's trip to Chicago, Ringel stated he followed up with defendant, "and she actually added more to the story saying, well, we also locked the brakes up on the way home in Pontiac." Ringel testified he spoke with an expert

in "seat belt syndrome." He also "tried to confirm the IDOT records for the area in Pontiac as [defendant] said, [and] made contact with the individuals they visited on that trip." However, Ringel explained "the State then interviewed the children [who] were in the car also. Those interviews came back to where it was not going to be a favorable defense anymore because none of the kids could confirm that any brakes were locked up either there or coming back." Ringel stated, "None of them remembered brakes locking up," and one of the children specifically "remember[ed] she fell asleep with her laptop on her lap, and when she woke up when they arrived the laptop hadn't moved." Ringel testified, "Richard's information and [defendant's] information were they locked [the brakes] up hard. From 65 to zero in literally a second and a half. To me a laptop is going to move."

¶ 41        With respect to his impeachment of C.B., Ringel testified, "What was consistent with [C.B.] in [her] interview was she did make it very clear right off the get-go she saw Richard punch [R.R.], but that it was at the old house." Ringel's strategy was to have C.B. or DeRosa "acknowledge [C.B.] said Richard punched [R.R.]" Ringel "knew that if [he] had to go too far *** or get too in depth with Detective DeRosa, it was simply going to be brought out that her testimony was inconsistent, but more importantly, that this punch *** was at the old house." Ringel "didn't want that out," because "it didn't fit the doctor's time frame of when this injury had to occur." Ringel stated, "None of their opinions gave us enough days to get back to the old house," and Ringel's medical expert only "put [the injury] back 24 days."

¶ 42        Ultimately, the trial court denied defendant's amended motion for a new trial.

¶ 43                          D. Sentencing

¶ 44        At the November 2020 sentencing hearing, the State called multiple witnesses in aggravation. In mitigation, defendant presented a group exhibit containing 11 character-reference

letters written on her behalf. In pronouncing sentence, the trial court noted the "distressing" evidence and stated:

> "Nothing that child did, or frankly for that matter, could have done warranted the type of abuse that was inflicted upon her. The demented idea that holding *** cans out while naked and being beaten as some sort of acceptable form of punishment is very troubling to the Court. *** That's not acceptable punishment. It's just pure evil."

Thereafter, the court sentenced defendant to natural life imprisonment on the count of first degree murder.

¶ 45        This appeal followed.

¶ 46                      II. ANALYSIS

¶ 47        On appeal, defendant alleges she received ineffective assistance from trial counsel and posttrial counsel. Specifically, defendant contends trial counsel's failure to more aggressively cross-examine C.B. amounted to ineffective assistance of counsel. Defendant further contends posttrial counsel rendered ineffective assistance by failing to argue trial counsel (1) operated under an actual conflict of interest, (2) failed to offer a limiting instruction regarding J.H.'s testimony, and (3) failed to object to the State's use of photographic and video evidence during its rebuttal closing argument. We address each of defendant's arguments in turn.

¶ 48                      A. Applicable Law

¶ 49        The sixth amendment guarantees a defendant the right to effective assistance of counsel at all critical stages of a criminal proceeding. U.S. Const., amend. VI; *People v. Hughes*, 2012 IL 112817, ¶ 44, 983 N.E.2d 439. A defendant's claim of ineffective assistance of counsel

is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29, 89 N.E.3d 366. To prevail, "a defendant must show that counsel's performance was (1) deficient and (2) prejudicial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 61, 115 N.E.3d 1148. "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88, 129 N.E.3d 755.

¶ 50        To establish deficient performance, the defendant must show "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14, 67 N.E.3d 233 (quoting *Strickland*, 466 U.S. at 688). A defendant is only entitled to competent, not perfect representation. *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14, 123 N.E.3d 1285. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. [Citation.]" (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 334, 948 N.E.2d 542, 551 (2011) (quoting *Strickland*, 466 U.S. at 689).

¶ 51        Prejudice is established when a reasonable probability exists, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004) (citing *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." (Internal quotation marks omitted.) *People v. Moore*, 2020 IL 124538, ¶ 29, 161 N.E.3d 125. "[T]here is a strong presumption of outcome reliability, so to prevail [on an ineffective assistance claim], a defendant must show that counsel's conduct 'so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced

a just result.' " *People v. Pineda*, 373 Ill. App. 3d 113, 117, 867 N.E.2d 1267, 1272 (2007) (quoting *Strickland*, 466 U.S. at 686). "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81, 25 N.E.3d 526.

¶ 52        "We review a defendant's claim of ineffective assistance of counsel in a bifurcated fashion, deferring to the trial court's findings of fact unless they are contrary to the manifest weight of the evidence, but assessing *de novo* the ultimate legal question of whether counsel was ineffective." *People v. Manoharan*, 394 Ill. App. 3d 762, 769, 916 N.E.2d 134, 141 (2009). In resolving issues related to counsel's performance, reviewing courts must consider the totality of counsel's conduct, not just an isolated incident. *People v. Hamilton*, 361 Ill. App. 3d 836, 847, 838 N.E.2d 160, 170 (2005).

¶ 53                    B. Ineffective Assistance of Trial Counsel

¶ 54        Defendant first argues trial counsel's failure to more aggressively cross-examine C.B. amounted to ineffective assistance. We disagree.

¶ 55        "Generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel." *People v. Pecoraro*, 175 Ill. 2d 294, 326, 677 N.E.2d 875, 891 (1997). This is so because the decision whether to engage in cross-examining a witness involves the exercise of counsel's professional judgment. *Pecoraro*, 175 Ill. 2d at 326. We will defer to trial counsel's strategy unless it "appears so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." (Internal quotation marks omitted.) *People v. Murphy*, 2019 IL App (4th) 170646, ¶ 34, 145 N.E.3d 56. "The reasonableness of counsel's actions must be evaluated from counsel's perspective at the time of the alleged error,

and without hindsight, in light of the totality of circumstances, and not just on the basis of isolated acts." (Internal quotation marks omitted.) *People v. Mabry*, 398 Ill. App. 3d 745, 753, 926 N.E.2d 732, 739 (2010). This court will not use hindsight "to second-guess trial counsel's strategy or the ways in which he implemented that strategy." *Mabry*, 398 Ill. App. 3d at 753.

¶ 56          In support of her position, defendant cites to a single statement made during C.B.'s pretrial interview with DeRosa wherein C.B. indicated "that Richard punched R.R. at the 'old' house but, at trial, C.B. testified that she did not remember telling DeRosa that Richard punched R.R." Unfortunately for defendant, this statement does not exculpate or exonerate her. As our supreme court observed in *People v. Jimerson*, 127 Ill. 2d 12, 34, 535 N.E.2d 889, 898 (1989), there can be legitimate reasons for counsel's not using prior inconsistent statements of a witness. "Counsel's strategic choices are virtually unchallengeable on appeal" (*People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 83, 126 N.E.3d 703), and the "value of the potentially impeaching material must be placed in perspective." *Jimerson*, 127 Ill. 2d at 33.

¶ 57          A review of the record shows Ringel did cross-examine C.B., who was seven years old at the time of defendant's trial, with respect to inconsistencies in her testimony. He also referred to some of the statements she made during her interview with DeRosa, including the statement at issue in this appeal. However, it appears Ringel was carefully avoiding the possibility the State could use C.B.'s statement to show Roundtree's punch occurred prior to the family's move in December 2018. Ringel explained at the evidentiary hearing he "didn't want that out," because "it didn't fit the doctor's time frame of when this injury had to occur." Aprahamian opined R.R.'s injuries likely occurred within three to five days prior to her death "based on the amount of inflammation, spillage, and some of the other signs of edema in the abdomen." Denton similarly opined R.R.'s fatal injuries occurred "at least several days" before

her death based on the amount of healing and "scar tissue inside her mesentry [*sic*] where the intestines eventually perforated." More importantly, Ringel's own medical expert could only stretch R.R.'s fatal injuries "back 24 days." In light of the evidence, we find nothing unreasonable or irrational with trial counsel's chosen trial strategy even though it proved unsuccessful. See *Mabry*, 398 Ill. App. 3d at 753.

¶ 58 In reaching this conclusion, we are also not persuaded by defendant's reliance on *People v. Salgado*, 263 Ill. App. 3d 238, 635 N.E.2d 1367 (1994), apparently for its factual similarity to this case. In *Salgado*, Robert Saltijeral (who was the object of a failed assassination attempt in another and unrelated case) testified he observed the defendant there, along with two codefendants, shooting on the night in question. *Salgado*, 263 Ill. App. 3d at 241. Saltijeral was the only witness in the defendant's trial to give direct testimony that he observed defendant as a shooter in the offense. *Salgado*, 263 Ill. App. 3d at 246. However, at the earlier trial of the two codefendants, Saltijeral testified he did not see the defendant shooting on the night in question. *Salgado*, 263 Ill. App. 3d at 246. "[T]he defendant's attorney did not attempt to impeach Saltijeral with this crucial contradictory testimony." *Salgado*, 263 Ill. App. 3d at 246. The Second District determined the failure to impeach was deficient performance on the attorney's part, and the defendant had been prejudiced because "the impeachment value of directly contradictory testimony made under oath at a prior trial by the State's premier eyewitness [could] hardly be overestimated." *Salgado*, 263 Ill. App. 3d at 247.

¶ 59 Unlike *Salgado*, the impeachment defendant seeks here is simply not in the same league as the impeachment available in *Salgado*—the direct contradiction of trial testimony by previously given, sworn, testimony. Although we note C.B. was the only witness to expressly testify she observed defendant kick R.R. in the stomach, the impeachment is not inconsistent

with her claim defendant kicked R.R. twice in the living room of their house. Thus, the impeachment would be significantly less substantial than in *Salgado*, and pursuing a more aggressive cross-examination of C.B., a seven-year-old child, may have had a very negative impact on the jury, isolating them from even considering Ringel's efforts to convince them the State failed to prove defendant guilty beyond a reasonable doubt. Any reasonably competent and moderately experienced trial counsel is familiar with just how fraught with danger aggressive cross-examination of young children may be. This is a situation clearly distinguishable from *Salgado*.

¶ 60        Accordingly, because Ringel's chosen tactic was not objectively unreasonable, defendant fails to overcome the strong presumption Ringel's decision regarding how to cross-examine C.B. constituted sound trial strategy. *Manning*, 241 Ill. 2d at 334. Defendant's ineffective assistance of counsel claim must therefore fail. See *Moore*, 2020 IL 124538, ¶ 29 ("A defendant must satisfy both prongs of the *Strickland* standard to prevail on an ineffective assistance of counsel claim.").

¶ 61                    C. Ineffective Assistance of Posttrial Counsel

¶ 62        Defendant next argues posttrial counsel rendered ineffective assistance by failing to argue trial counsel (1) operated under an actual conflict of interest, (2) failed to offer a limiting instruction regarding J.H.'s testimony, and (3) failed to object to the prosecutor's use of photo and video evidence during its rebuttal closing argument. We disagree.

¶ 63                        1. *Actual Conflict*

¶ 64        "A criminal defendant's sixth amendment right to effective assistance of counsel includes the right to conflict-free representation." *People v. Yost*, 2021 IL 126187, ¶ 36, 184 N.E.3d 269. "The guarantee of conflict-free representation ensures that a defendant is provided

assistance by an attorney whose allegiance to his client is not diluted by conflicting interests or inconsistent obligations." (Internal quotation marks omitted.) *Yost*, 2021 IL 126187, ¶ 36.

¶ 65 "When, as here, a defendant" raises a conflict of interest for the first time after trial, "a defendant 'must demonstrate that an actual conflict of interest adversely affected his lawyer's performance.' " *People v. Nelson*, 2017 IL 120198, ¶ 30, 89 N.E.3d 725 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980)). To make such a showing, the defendant must demonstrate (1) some plausible alternative defense strategy or tactic might have been pursued and (2) the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests. *Nelson*, 2017 IL 120198, ¶ 37. The defendant need not show the alternative defense would have been successful had it been used but rather that it possessed sufficient substance to be a viable alternative. *Nelson*, 2017 IL 120198, ¶ 37. This requires the defendant to show "some specific defect in his counsel's strategy, tactics, or decision making attributable to the conflict." *People v. Spreitzer*, 123 Ill. 2d 1, 18, 525 N.E.2d 30, 36 (1988). "Speculative allegations and conclusory statements are insufficient to establish an actual conflict of interest." *Yost*, 2021 IL 126187, ¶ 38.

¶ 66 Here, defendant's argument Ringel's purported loyalty to Roundtree precluded him from pursuing Roundtree as an alternative cause of R.R.'s fatal injuries is entirely speculative. Ringel investigated defendant's claim that Roundtree allegedly admitted he may have caused R.R.'s fatal injuries. Defendant told Ringel that Roundtree "sent her a text message saying I think I hit her too hard. She made it clear that there would be days' worth of these messages," but Ringel was unable "to find a single one that even related to that subject matter."

¶ 67 Further, defendant fails to demonstrate Ringel's decision to pursue the "seat belt syndrome" defense was attributable to any "divided loyalties" between her and Roundtree. To

the contrary, it was a tactical decision based on information relayed to him by Roundtree *and defendant* that "they locked [the brakes] up hard. From 65 to zero in literally a second and a half." Ringel "tried to confirm the IDOT records for the area in Pontiac as [defendant] said, [and] made contact with the individuals they visited on that trip." However, after the State interviewed the children who were also in the car, "it was not going to be a favorable defense anymore because none of the kids could confirm that any brakes were locked up either there or coming back." In fact, one child specifically "remember[ed] she fell asleep with her laptop on her lap, and when she woke up when they arrived[,] the laptop hadn't moved."

¶ 68        Moreover, it is difficult to imagine how a conflict of interest actually affected Ringel's performance. Defendant's bare allegation Ringel's loyalties were "impermissibly divided" because Ringel "met with Richard *** at least 20 times, while only meeting 7 times with defendant" is insufficient. Ringel "told [defendant] clearly" he needed to establish to Roundtree he was not his attorney. Although Roundtree "would come to [Ringel's] office religiously," Ringel "would make it clear every time" he did not represent Roundtree. Ringel also denied promising Roundtree he would not blame him for R.R.'s murder. Rather, Ringel "told him the opposite," and Ringel informed defendant "if any evidence comes up that puts the needle on [Roundtree] we're going to go after him." In fact, Ringel "fully intended to get to the pinch marks through Richard himself." However, after the State received defendant's incriminating letter to Roundtree, instructing him to "think of a story and get [her] out of this," Ringel "did everything [he] could to prevent the jury from learning of [it]." Ringel reasoned "the jury would have inferred that as a person asking another person to take responsibility for something that they did, to go ahead and be willing to accept the blame." The letter was damning evidence against defendant in her own words. Any strategy leading to the State's use of the letter

would have been the equivalent of a confession of guilt on the part of defendant. As a result, Ringel decided against calling Roundtree to testify and rightly adapted his trial strategy to prohibit the State from introducing defendant's letter in any way.

¶ 69   As defendant has not demonstrated any specific defect in Ringel's performance which we may attribute to conflicting duties he allegedly owed Roundtree, her argument Ringel labored under an actual conflict of interest fails. See *Nelson*, 2017 IL 120198, ¶ 37. Simply calling it a conflict does not make it so. Thus, because defendant's underlying claim of ineffective assistance of counsel fails, it cannot be said posttrial counsel rendered ineffective assistance for failing to raise this issue as it is without merit, and no reasonable probability exists the outcome would have been different. See *Evans*, 209 Ill. 2d at 219-20.

¶ 70                                    2. *Limiting Instruction*

¶ 71   Defendant argues trial counsel was ineffective for failing to request a limiting instruction with respect to J.H.'s testimony at trial. We disagree.

¶ 72   The State, at an October 2019 pretrial hearing, indicated it sought to call J.H. to show R.R.'s "state of mind." The State noted R.R.'s statements to J.H. were relevant only to the domestic battery charges and "obviously, the victim's state of mind [was] not relevant as it pertains to the murder charges or the endangering charges." Ringel did not object, but he told the trial court he would "be asking *** for a limiting instruction to let the jury know you can only consider those statements for those counts."

¶ 73   Here, defendant fails to overcome the presumption Ringel's decision to not request the limiting instruction was part of a reasonable trial strategy. "It is well settled in Illinois that counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy." *People v. Sims*, 374 Ill. App. 3d 231, 267, 869

N.E.2d 1115, 1144 (2007). The decision to not request a limiting instruction may have been trial strategy to avoid highlighting J.H.'s observation of R.R.'s numerous injuries and drawing undue attention to R.R.'s unfavorable statement to J.H. identifying defendant as her abuser. See *People v. Jackson*, 391 Ill. App. 3d 11, 34, 908 N.E.2d 72, 93-94 (2009) ("Defense counsel's choice not to seek a limiting instruction *** was purely a strategic decision made so as not to emphasize the evidence which, while proper, portrayed defendant in a bad light. Therefore, defense counsel's tactical decision cannot be the subject of a claim of ineffective assistance."); see also *People v. Perez*, 2012 IL App (2d) 100865, ¶ 66, 969 N.E.2d 893 (stating trial counsel's decision whether to request a limiting instruction may be viewed as strategic). As such, defendant cannot show deficient performance in the tactical decision to decline a limiting instruction on such a peripheral matter.

¶ 74         Further, defendant has not shown she suffered any prejudice resulting from counsel's decision not to seek a limiting instruction. See *Evans*, 209 Ill. 2d at 219-20. We note Ringel expressly conceded defendant was "100 percent guilty of every domestic battery [the State] charged her with" during his closing argument. Additionally, Denton testified he observed "conservatively *** about 50 different *** patterned scars and marks on [R.R.'s] body." He further stated R.R.'s fatal injuries were deliberate and consistent with being "struck in the right lower abdomen by an adult." C.B. witnessed defendant kick R.R. twice in the stomach while in the living room of their house. Defendant punished R.R. for "[n]othing." Although R.R. was not misbehaving, defendant kicked her anyway, and C.B. testified R.R. "busted her head on the very top where the TV was." Defendant "started laughing at [R.R.]," and C.B. further testified defendant kicked her in the stomach again. The jury also observed videos documenting various levels of abuse being meted out to R.R. by defendant.

¶ 75     Because defendant cannot overcome the presumption Ringel's decision to not request any limiting instruction was part of a reasonable trial strategy and failed to show she suffered any prejudice as a result of Ringel's alleged error, her claim of ineffective assistance of counsel must fail. See *Moore*, 2020 IL 124538, ¶ 29 ("A defendant must satisfy both prongs of the *Strickland* standard to prevail on an ineffective assistance of counsel claim."). Thus, posttrial counsel cannot be deemed ineffective for failing to raise this meritless issue as there is no reasonable probability a different result would have occurred. See *Evans*, 209 Ill. 2d at 219-20.

¶ 76                              3. *Closing Arguments*

¶ 77     Defendant argues she was denied the effective assistance of counsel because trial counsel did not object to the State's use of a two-minute "montage of videos, texts and photographs," as well as "a slide-show of autopsy photographs which were admitted at trial" in its rebuttal closing argument. Specifically, defendant alleges "[i]t was unreasonable and not trial strategy for counsel not to object to the prejudicial depiction of the autopsy photographs and video montage because the cause of R.R.'s death and *** the injury which led to her death were not disputed by the parties." We disagree.

¶ 78     Prosecutors are afforded wide latitude during closing arguments and may properly comment on the evidence presented and reasonable inferences drawn therefrom, "even if the suggested inference reflects negatively on the defendant." *People v. Jackson*, 2020 IL 124112, ¶ 82, 162 N.E.3d 223. However, a prosecutor may not (1) misstate the evidence, (2) argue facts not in evidence, or (3) "make remarks with the sole effect of inflaming the jury's passions or developing its prejudices without casting any light on the issues." *People v. Short*, 2020 IL App (1st) 162168, ¶ 76, 159 N.E.3d 425. When addressing claims of impropriety, reviewing courts consider the argument as a whole, examining the challenged statements in the context of the

entire closing statements. *Jackson*, 2020 IL 124112, ¶ 82; see also *People v. Kallal*, 2019 IL App (4th) 180099, ¶ 35, 129 N.E.3d 621.

¶ 79 Here, R.R.'s autopsy photographs were admitted into evidence during Denton's testimony as he detailed the nature and extent of R.R.'s injures and cause of death. Based on their nature and location, Denton was able to testify with certainty R.R.'s "repetitive injuries" were a result of ongoing child abuse, and the injuries which caused R.R.'s death were consistent with being "struck in the right lower abdomen by an adult." This supported the State's theory defendant "systematically and brutally abused [R.R.]," and defendant caused R.R.'s fatal injury when she kicked R.R. twice in the abdomen. Illinois courts have repeatedly recognized the admission of photographs of a decedent to aid the testimony of a witness, including a medical examiner, is "valid" and appropriate. *People v. Chapman*, 194 Ill. 2d 186, 220, 743 N.E.2d 48, 69 (2000); *People v. Tatum*, 2019 IL App (1st) 162403, ¶ 111, 165 N.E.3d 853. Despite defendant's assertion the autopsy photographs and "video montage" were not relevant because she did not dispute the cause or manner of R.R.'s death, "the State may offer evidence," including photographic and video evidence, which "tends to prove any fact it needs to prove, such as the cause or manner of death, *even if that fact is not disputed*." (Emphasis added.) *Tatum*, 2019 IL App (1st) 162403, ¶ 113.

¶ 80 Not only did the autopsy photographs aid in understanding Denton's testimony, the brief, two-minute "montage of videos, texts and photographs"—which were admitted into evidence—was also used to rebut the defense theory R.R.'s injuries were accidental and establish defendant's motive, mental state, and hostility toward R.R. Ultimately, the State's use of R.R.'s autopsy photographs and two-minute "montage" were used to support the State's argument it had satisfied its burden of proving each of the requisite elements to sustain convictions for three

counts of first degree murder, one count of aggravated domestic battery, one count of aggravated battery of a child, eight counts of domestic battery, and two counts of endangering the life or health of a child. See *People v. Graves*, 2012 IL App (4th) 110536, ¶ 41, 965 N.E.2d 546 (finding no error in allowing the State to replay portions of a videotape during closing argument where it had been properly admitted into evidence, only limited excerpts were played, and it consisted of a small part of the State's closing argument).

¶ 81 Moreover, the trial court instructed the jury both opening statements and closing arguments were not evidence and to disregard any statement or argument made by counsel which did not comport with their recollection of the evidence. See *People v. Price*, 2021 IL App (4th) 190043, ¶ 154. Given Ringel's performance throughout the proceedings, no reason exists to doubt the reliability or fairness of defendant's trial, and Ringel's alleged failure to object to the State's use of such evidence during its rebuttal closing argument was not ineffective assistance. See *Bradford*, 2019 IL App (4th) 170148, ¶ 14 (stating defense counsel cannot be deemed ineffective for failing to make a futile objection).

¶ 82 As a result, it cannot be said posttrial counsel rendered ineffective assistance for not raising this meritless issue because there is no reasonable probability a different result would have occurred. See *Evans*, 209 Ill. 2d at 219-20. Thus, for all these reasons, we find defendant failed to establish the ineffective assistance of either trial counsel or posttrial counsel. See *Moore*, 2020 IL 124538, ¶ 29 ("A defendant must satisfy both prongs of the *Strickland* standard to prevail on an ineffective assistance of counsel claim.").

¶ 83                                    III. CONCLUSION

¶ 84 For the reasons stated, we affirm the trial court's judgment.

¶ 85 Affirmed.